Moving to the fourth case this morning, United States v. Walton. Mr. Mayor. Good morning, Your Honors. May it please the Court. I represent Mr. Marcel Walton, who was pled guilty to mail fraud in connection with tax filings involving trusts. These are often referred to as Moorish tax fraud cases because many of the people, but not all of them, who participated in these particular filings were members of a religious faith based on the Moorish Temple, Moorish Science Temple of America. Sovereign citizens, by another name. I don't think that's fair, Your Honor, without getting into a great lengthy thing to all Moors because a lot of Moors disclaim any involvement with this. But there was clearly a connection between some Moorish temples and some of these tax filings. And that's part of what's at issue here. But the reason why we're here today is because the district court at sentencing relied upon disputed non-record facts in sentencing Mr. Walton, including facts that many of the people that Mr. Walton assisted were elderly, homeless, cared for people with special needs, were particularly ignorant, and that these people were misled. While Mr. Walton knew what he was doing, the people that he helped were misled into doing it. The court also concluded that Mr. Walton was a leader, whereas everybody else that had ever been sentenced in the Northern District of Illinois was a follower. None of them had helped others do these sorts of fraud. The judge also indicated that Mr. Walton did this in order to get a religious tithe, which the court found to be cynical, ironic, and an aggravating factor, and that the loss in this case of $16 million, which was a negotiated, stipulated amount, was so much higher than any of the other losses on similar cases on a chart the government had provided that he couldn't base any sentencing determination on those similar sentences. The sum was $2,200,000? On the chart that the government provided, that is correct. But the problem here is that the facts on which the court relied were provided by the government. They weren't in the record. Many of them were disputed, and many of them turned out to be inaccurate. But many of these facts we didn't even hear about for the first time until at sentencing from the prosecutor's own mouth. So if you go to what Rule 10 says is the record, none of these facts are in the record. And so you have to trace back, well, where did these facts come from? The two facts, though, that were important, at least as I read the transcript, in combination with one another were the leader point, and there was an organizer-leader enhancement as part of the guidelines, was there not? That's correct, Your Honor, and he stipulated that. The second point was the money, right? The $16 million that intended loss was stipulated to. So it's hard for Mr. Walton to say that he was caught off guard by Judge Durkin talking about the leadership role that he had in the tax fraud scheme. Well, it's not just that he agreed that he qualified for the leader and organizer enhancement under the guidelines, which is simply for purposes of calculating the guidelines range. That is not a part of a 3553A analysis, which is how big a role did you play? Because it's a big difference to say I helped a handful of people and I was involved in hundreds of different tax filings. And that is where the government, when the court asked the government, you know, how many people did he help? They said we have talked to, interviewed, or had in the grand jury 17 other people, and they all identified Mr. Walton as the one and only one who helped them. That was not true. They had only talked to nine people of the 17 who had interviews, and those interviews weren't in the record. And it's from those interviews, we think, that the government then began asserting, you know, special needs, people that were homeless, people that were vulnerable, people who sincerely believed in the Moorish faith and that they were entitled to this. Well, how did you find out of the 17 they only interviewed nine? That's correct, Your Honor, if I said a different number. No, that's what you said. That's right. How did you determine that? Well, the government finally admitted it, I think, in this brief. And if you go back into some of the stuff that's not in the record, after the sentencing we were able to piece together that, oh, I think it comes up in the government's sentencing memorandum, which is also not part of the record. So facts asserted by the government at a sentencing hearing, facts put in their memorandum, that's not part of the record. That's not something on which the court can rely. In addition to the leadership, they also talked about how, while there had been more than 1,000 fraudulent Moorish tax fraud prosecutions and dozens of prosecutions, that nobody else that has been prosecuted was, played any role as a leader or organizer. And the government, I think, was just, they were caught off guard because they said, at first they said, not to our knowledge, and then they said, well, we can verify that no one got this same enhancement. Well, that doesn't mean they weren't a leader or organizer, which is what we said to the court, you shouldn't listen to any of this, but if you're going to listen to it, you at least ought to, we ought to get the full picture of what these people were involved in. And one of the people, Fannie Cable, who had been previously sentenced, the government had said that she was not a leader or organizer. Well, we introduced evidence, and there's an email attached to our sentencing memorandum which shows Ms. Cahill introducing Mr. Walton and others to this precise thing. There's actually evidence in the record where it looks like Ms. Cahill is the reason why Mr. Walton got involved, and where the government said the exact opposite, she wasn't a leader or organizer and she didn't help him. In that chart, the government also said that Ms. Cahill was only responsible for a $2.1 million loss. Well, we later found out that in pleadings in her case, the government had said she was responsible for a $4.4 million loss. Well, they didn't tell the court that prior to the sentencing. Same with a gentleman named Derrick Jackson. He was responsible, according to the chart, for a $1.3 million loss. The government had previously claimed he was responsible for a $7 million loss. Well, part of what Judge Durkin concluded is the loss was so much higher. I'm sorry, Mr. Merrill. I'm sorry to interrupt you. At the end of the day, it came in two months under, right, the low end of the advisory range. And am I misreading the sentencing transcript to, in substance, just say, you know, Mr. Walton did bring other people to this scheme. And that's what differentiates him from a lot of the others. I mean, he recruited other people to file false tax returns. In other words, a lot of the points you're making, even if you credit that they're literally true, I mean, how did it really impact anything here? Because you're not contesting that he was recruiting others into the scheme. Your Honor, the only thing in the record is that he said he recruited, quote, others, and that he only identifies one other person. And that's it. And yet the government stood up and said 17 others. Well, we think others could mean three or four or five. Well, five of them got prosecuted, didn't they? That's correct, Your Honor. But the government told the judge that it was 17 others, and that these 17 others were vulnerable, homeless, cared for disabled relatives. And that clearly played into the judge's, I believe. Well, the judge did find that there was no dispute, he says, that this defendant, Walton, lured 17 people into criminal activity. Well, there was a dispute. Because that's, if you go back through the transcript, we did say, in addition that we disagreed with some of that, we said we don't even have information about all these people. That's the last thing that we said at the sentencing hearing. The government was referring to information about these 17 others that had never been provided to us. It turns out they didn't even have it, because not all 17 were interviewed. But at the sentencing, they said, we've talked to 17 people. They said it was him and only him, and here's some factors about it. Your Honor, ultimately, we think that this should just be vacated, sent back for resentencing based on a full record, based on the entire record and only the record. Does your client face a heavier penalty if they do support it? Potentially, Your Honor. Does he know that? He does know that. But if you look at this chart of sentencing, nobody in any of these cases, other than except one person in an unusual situation, got sentences that were within or even close to the guidelines. Many of them got sentences that were far below. And Judge Durkin, based on representations the government made, declined to provide that kind or even consider that kind of sentence for Mr. Walden. And we think, for that reason, his due process rights were violated. I will save whatever time I have left for tomorrow. Thank you. I'll also give you a full minute when you come back. Good morning. May it please the Court. My name is Georgia Alexakis, and I represent the United States. This Court should affirm the defendant's sentence. The district court did not rely on inaccurate or unreliable information when sentencing him. And I want to start off by responding to a number of representations made by the defendant. In particular, I'll start with the representation about what is or is not in the record on appeal. The Federal Rules of Appellate Procedure, 10A, specifically says that original papers and exhibits that are filed with the district court are part of the record on appeal. And so in this case, that would include the party's sentencing memoranda, documents that have been filed with the district court, and it would also include the government's version of the offense, which was attached to the PSR, as reflected on page 3 of the sentencing transcript in this case, and as all PSRs are, filed then with the district court. So just to set that stage. When he pled guilty, you provided a sentencing memoranda. I mean a memorandum of the fact. Correct, Judge. Along with the plea agreement, there was factual basis. There was the government's version of the offense that was filed approximately 7 months before the sentencing hearing. There was the government's sentencing memoranda that was filed approximately 3 to 4 months later. There was the defendant's sentencing memoranda that then responded to the government's version of the offense and the sentencing memoranda in its own sentencing memoranda filed approximately 2 months before the sentencing hearing. And so that chronology that I've laid out responds to a separate point that defense counsel made earlier, which is that the prosecutor sprung new information, the government sprung new information, on the defendant at the sentencing hearing. And yet, if the court looks at these filings, the government's version of the offense, the PSR, the government's sentencing memoranda, consistently across each of those documents, the government makes the same representations, the same presentation of arguments and facts that it makes at the sentencing hearing in September of 2017. And in particular, those representations are representations that at least among the 17 individuals that the defendant assisted in filing these fraudulent returns were individuals who were economically vulnerable. And again, another representation made were that among these 17 individuals were individuals who were enticed to join the defendant's religion, to join his temple, in part based on this representation that the moors were entitled as some sort of reparations per this belief system, that they're entitled to some kind of reparations that then takes the form of a tax refund. These are representations that were made consistently in anticipation of the sentencing hearing. The defendant had the opportunity in advance of the sentencing hearing to object to the government's presentation of evidence, to object to the PSR. And indeed, the defendant used that opportunity to rebut particular arguments, to respond to particular representations that were being advanced by the government and the probation office. And the court can see that in the defendant's sentencing memorandum, which dedicates a significant number of pages in that memorandum to specific objections to the PSR, to specific objections to the government's version of the offense. The defendant does the same thing at the sentencing hearing. There's a lengthy colloquy with the district court, specifically talking about raising objections to particular assertions that have been made by the government and by probation. And yet, at no point does the defendant object to two of the assertions that are raised today. One, that some of the individuals that the defendant assisted were economically vulnerable. And two, that some of these 17 individuals were enticed to participate in this kind of fraudulent behavior because of the defendant's religious authority that he exercised over them. And in the course of the scheme, asked for a commission, a fee, what the government characterized as a tithe during the sentencing hearing. So there was no objection to those representations. And it is important to point out that these representations were based on reliable evidence. And of course, that is what the district court needs to know when sentencing a defendant. It needs to consider correct information, and the district court here specifically acknowledges that in the course of the sentencing hearing. What, if anything, should we make of the alleged disparity between Mr. Walton recruiting 17 others into the scheme and only 9 individuals apparently being interviewed by the government? Is that an apples-to-apples or apples-and-oranges comparison? Well, I think it's a bit of a red herring, Judge. I mean, first of all, the defendant says that the government misled the district court in asserting that 17 individuals were interviewed and that this was another piece of new information presented at the sentencing hearing. But on page 8 of the government's version of the offense, the government is very specific, that they interviewed 9 individuals and that those 9 individuals each identified the defendant as the individual who assisted them in particular or who assisted others, meaning that they viewed, they saw the defendant assisting others. In the particular example that's raised in the government... Is that how we get to 17? Correct, Judge. So it's the 9 individuals accounting for themselves and then, through some combination of the 9, accounting for the other 17. At the end of the day... How is that presented to the judge? Is that just as you describe it now? Well, as I said, Judge, the information about the 9 that were interviewed were presented... That 9 were interviewed was presented in the government's version of the offense. Some explanation of how some of the 9 could account for the other 8 was also part of the government version of the offense. But I think what's important... Presented to the judge. Presented to the judge. And then there was certainly discussion of these interviews during the sentencing hearing. But I think what's important to keep in mind is that there's no indication in the sentencing transcript in the record that the district court placed a particular amount of weight on how many people the government interviewed. And then this goes back, of course, to the idea that the defendant never objected to representations made based on... Well, he did say... The district judge said... The judge responded that there was no dispute that this defendant walled and lured 17 people into criminal activity. Correct, and I think that the reason why there's no dispute there, Judge, is because the defendant not only admitted in his plea agreement to the $16 million loss amount, but in filings, and in particular in his sentencing memorandum in advance of the hearing, admitted that he agreed with the government that that $16 million loss amount came from the 20 trust tax returns, is how he phrases it, which is the 20 trust tax returns that are listed on a summary chart that accompanied the government's version of the offense. And those 20 returns tie to the 17 individuals. So the defendant's position that is asserted in the briefs that there was a dispute over how many individuals comprised the $16 million loss amount is not borne out by the record, because you have admissions in the record from the defendant admitting that 20 trust tax returns filed by these approximately 17 individuals is what led to the $16 million loss amount. And the loss is 16, right? 16, Judge. Yeah. And that's the intended loss. Intended loss, yeah. Right, and I want to focus a little bit on that intended loss, because I think another source of confusion here is that the defendant is comparing apples to oranges when talking about various loss amounts that the government set forth in its comparison chart to the district court versus loss amounts that may have appeared in other filings in other district courts related to other defendants. And so, for example, the defendant focuses on Fannie Cahill, where on the sentencing comparison chart that was presented to the district court, the intended loss figure that appears is $2.2 million. Defendant argues, well, if you look at the sentencing memorandum that the government filed in Ms. Cahill's case in a different district court case, the number that's actually reported there is $4 million. Well, what the defendant is not accounting for is the fact that under the guidelines, an intended loss cannot account for duplicate returns. So Ms. Cahill may have filed returns seeking 4 point... I think it was $4.1 million or approximately $4 million. But if she filed multiple returns for a particular tax year, then those duplicate returns need to be factored out for purposes of the guidelines calculations. And so there were... And the same thing happens with Derek Jackson as well. It's not a $7 million figure that the defendant cites to once you remove duplicate returns and once you account for only what he's personally responsible for as opposed to what his entire scheme was responsible for. And then finally, very quickly, because I see my time is up, almost up, I do want to address this point about the weight that the district court placed on the defendant for being a leader organizer. The government never said that he is the only leader organizer in an informal sense. The government certainly asserted correctly that the defendant was the only leader organizer for purposes of 3B1.1 amongst the 23 defendants that were laid out on that sentencing comparison chart. The defendant argued to the district court quite vigorously that someone like Ms. Cahill should be considered at least informally as a leader organizer, and the district court noted that. I think I don't have the particular citation. I think it's at page 80 of the sentencing transcript. The district court specifically says, I'm not accounting for the Cahills. I'm essentially setting them aside, and even setting them aside meaning even recognizing your argument that they might be leaders and organizers in some capacity, that still leaves approximately 22 other defendants on this comparison chart who were fairly characterized as followers rather than leaders. Unless there are any further questions, I'll ask this court to affirm the district court's judgment. Thank you. Thank you, counsel. I'll give you a full two minutes there. The government went over on theirs. All right, thank you, your honor. Just to be clear, at the sentencing, the government said that they had interviewed all of the 17 others or they had come into the grand jury, and that all said that Walton and nobody else, this is a quote from the government's presentation, assisted them. That is what they said, and that is far different from what they said in the government version where the government version just simply says we've interviewed nine people. Here's people that we've interviewed, and we believe that they've provided information that could be useful. It's important to remember in terms of what is the record before the district court. We're talking about due process. We're talking about the government bearing the burden of proving these facts at sentencing, which they can do via direct examination where we have a chance to cross-examine. None of this stuff was presented, and we would submit that pursuant to Seventh Circuit Rule 10 that a sentencing memorandum is not part of the actual record. That's argument. They can certainly bring it to this court's attention for purposes of resolving an appeal, but facts that are set forth by a party in a sentencing memorandum are not part of a record consistent with due process when it's disputed, particularly when it's disputed. Ultimately, none of these facts were in the record, including about the 17 others. In addition, we just talked about what the government said at sentencing about these other people that have pled guilty. I'm quoting from the government's presentation. They said the individuals who have previously pleaded guilty or have been sentenced or have gone to trial and been sentenced by the courts were not leaders. They were not organizers. They were temple members following the instructions of Mr. Walton or someone like him. And it was only later that the court said, did any of these people get a leader-organizer enhancement, and they said no. But initially they just said he's the only leader and organizer to be prosecuted and sentenced thus far, and you should treat him differently. And we think the court did treat him differently, but they shouldn't have because if the court had had the full picture, they would have seen that he was really more similar to some of these people that have been sentenced before. And the back-and-forth we've had today, this all should have happened before Judge Durkan. It didn't because a lot of it came up for the first time at sentencing. A lot of it wasn't in the record and couldn't be directly refuted at that point. And we would ask the court to vacate and remand for a resentencing. Thank you, counsel.  I was, Your Honor. You have the thanks of the court for your excellent representation. Thank you. Thanks to both counsel and the cases taken under advisement.